# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

───────────────────────────

William H. Evans, Jr.,
     Petitioner,


     vs.                             Case No. 1:06cv746
                                     (Dlott, J.; Hogan, M.J.)


Edwin Voorhies, Jr.,
     Respondent.


───────────────────────────

## REPORT AND RECOMMENDATION

───────────────────────────


     Petitioner, who currently is incarcerated at the Southern Ohio Correctional Facility in Lucasville, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the petition with exhibits; respondent's "Answer/Return Of Writ" with exhibits, including a copy of the trial transcript; and petitioner's "traverse" in reply to the return of writ.  (Docs. 2, 25,

33).[1]  By separate Order issued this date, petitioner has been allowed to supplement the record with additional exhibits submitted by him (*see* Docs. 5-7, 17, 24), many of which are duplicates of exhibits attached to the return of writ or the petition; in addition, among other things, the undersigned has denied petitioner's motion for recusal from the case (*see* Doc. 46).

## Factual And Procedural Background

On August 27, 2004, the Scioto County, Ohio, grand jury returned an indictment charging petitioner with one count of murder in violation of Ohio Rev. Code § 2903.02(B).  (Doc. 25, Ex. 2).  After a jury trial, petitioner was found guilty as charged.  (*Id.,* Ex. 3).  Pursuant to an Entry filed March 28, 2005, petitioner was sentenced to a term of imprisonment of fifteen (15) years to life.  (*Id.*).

With the assistance of new counsel, petitioner timely appealed to the Ohio Court of Appeals, Fourth Appellate District.  In the brief filed by counsel, petitioner raised seven assignments of error, including the following claims:

I.  The trial court committed plain error in ordering the appellant to wear

---

[1]Petitioner recently filed a notice of dismissal (Doc. 47), followed by a notice of "re[s]cission of dismissal" (Doc. 49), which in turn was followed by another notice of "dismissal of case" (Doc. 51).  The district judge denied petitioner's "re[s]cission of dismissal" by notation entry on August 23, 2007 (*see* Doc. 53); however that order has since been vacated.  Moreover, although respondent has filed a responsive pleading to petitioner's second notice of "dismissal of case," in which he states that he has "no objection" to the dismissal of the instant action (*see* Doc. 52), no stipulation of dismissal signed by all parties has been entered in this case.  Because petitioner seeks the dismissal of this action after the filing of respondent's return of writ in answer to the petition, the petition may not be dismissed without prejudice at the petitioner's instance "save upon order of the court and upon such terms and conditions as the court deems proper."  *See* Fed. R. Civ. P. 41(a)(1)-(2).

It is **RECOMMENDED** that the petition not be dismissed as requested by petitioner because (1) petitioner has exhibited ambivalence about seeking the voluntary dismissal of his petition; and (2) by the time petitioner filed his first notice of dismissal, which normally would be without prejudice under Fed. R. Civ. P. 41(a)(1),  the undersigned had already expended substantial time and judicial resources in drafting a Report and Recommendation to deny the petition with prejudice based on the merits of petitioner's claims for relief.

handcuffs during his trial.

II.  Trial counsel's failure to move to withdraw amounts to ineffective assistance of counsel when the trial court's decision to shackle the appellant throughout the trial is not plain error.

III.  The trial court abused its discretion in failing to provide an instruction on voluntary manslaughter.

IV.  Appellant suffered ineffective assistance of counsel for counsel's neglect, ignorance, or senseless disregard in permitting appellant's prior bad acts to be introduced at trial.

****

VII.  The appellant suffered prejudice by way of the cumulative effect of all errors throughout the trial.

(*Id.,* Ex. 5).

Petitioner subsequently was permitted to amend his brief on appeal to include additional assignments of error raised by him in a *pro se* "Petition To Intervene and Amend."  (*Id.,* Exs. 7-8).  In this pleading, petitioner essentially alleged that (1) the trial judge was biased because he was related to the victim's family; and (2) the investigating police officers, some of whom were also related to the victim's family, tampered with evidence  at the crime scene, engaged in perjury, and failed to conduct certain tests at the crime scene.
(*Id.,* Ex. 7).

On May 19, 2005, the Ohio Court of Appeals overruled the assignments of error asserted in both appellate counsel's and petitioner's *pro se* briefs and affirmed the trial court's judgment of conviction and sentence.  (*Id.,* Ex. 10).  In its Decision and Judgment Entry, the court made the following findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[2] regarding the events occurring in the early

_____

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless

morning hours of August 11, 2004 that resulted in petitioner's murder conviction:

> At trial, Lieutenant Debbie Brewer testified that she responded to the victim's residence at approximately 1:50 a.m. in response to a 911 call. She observed the victim crying.  The victim stated that she and Evans had argued.  After she and Sergeant Compton secured the scene, they left.  Around 3:24 a.m. they returned to the same residence in response to an emergency call.  She discovered [the victim] laying on the bed "in an awkward position," with "obvious bruising to the face."

> Sergeant James Charles also responded to the second emergency call. He noticed "quite a bit of discoloration around [the victim's] neck."  He stated that he collected three hairs from her hand.  He did not notice any blood stains or body tissue on the shop vac and did not observe any other damage.  He "saw nothing of evidentiary value on the outside" of the shop-vac.

> Dr. Robert Pfalzgraf, the coroner, stated that the victim's cause of death was manual strangulation with blunt impacts to the chest and head.  The victim "received multiple blunt impact injuries or blows to the head and torso which resulted in multiple internal injuries[.]  [S]he also was manually strangled and the combination of the manual strangulation and the blunt impact injuries to her body were the cause of death."  She had lacerations about her head, torso, abdomen, back and arms and blunt impact trauma to the lower extremities.   The coroner observed hemorrhages in the eyelid, which showed pressure was applied to her neck.  The victim had multiple rib fractures and the ribs punctured her lungs.  He stated that the victim must have endured very forceful blows to the chest area. He also stated that her heart was bruised and the back surface of her heart suffered a laceration, due to a forceful blow to the chest that probably caused compression of the heart between the breastbone and the backbone.

---

petitioner rebuts the presumption by "clear and convincing evidence."  Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein. Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

(*Id.,* pp. 7-9).

Petitioner filed a *pro se* motion for reconsideration under Ohio R. App. P. 26(B), wherein he sought to reopen the appeal based on his appellate counsel's alleged failure to "adequately represent" him or to present the "most appealable" assignments of error, most notably a claim asserted as *pro se* Assignment of Error Eight that was "stricken" and thus not considered by the Court of Appeals. (*Id.,* Ex. 11).  On June 23, 2006, the Ohio Court of Appeals denied petitioner's application for reopening. (*Id.,* Ex. 12).

Thereafter, petitioner filed a timely *pro se* appeal to the Ohio Supreme Court. In his jurisdictional memorandum, he asserted the following propositions of law:

1.  The appellate court failed to allow appellant the right to redress, after dismissal of ineffective counsel. . . .

2.  The appellate court failed to fully and properly consider a "petition to Intervene," entered pro se, before counsel[']s dismissal, by failing to fully address the evidence of evidence tampering and perjury, which ... are on the record. . . .

3.  Appellant was denied the right to a public trial and an entirely open court, which justifies reversal. . . .

4.  The trial court judge erred reversibly in failure to recuse himself due to prejudice and relationship to the victim. . . .

5.  Prosecution failed to enter known exculpatory evidence, being every single cause of appeal, and the wrongful conviction itself, deliberately misleading the court. . . .

6.  The crime scene detectives and judge are related to the victim in my murder case.  Provable evidence tampering and perjury took place during trial, which the record and discovery supports fully.  Of which the denial of an expert forensic specialist violated due process and doomed appellant.  Appellant requested the appointment of the same on grounds of my assertion of tampering. . . .  Appellant asserts that all evidence was the result of illegal conduct of an official, and is thus inadmissible under

5

the due process clause of the 14th amendment. . . .

7.  The trial court erred in ordering appellant to wear handcuffs and shackles during trial. . . .

8.  The trial court erred in failing to provide an instruction on reckless homicide, or voluntary or involuntary manslaughter. . . .

9.  Appellant suffered ineffective trial counsel for counsel's senseless disregard in permitting appellant's prior bad acts to [be] introduced in trial. . . .

10.  Appellant suffered manifold violations of the U.S. Constitution, and subsequently the Ohio Constitution, and federal and Ohio criminal laws, by the cum[]ulative effects of all above errors.

(*Id.,* Ex. 15).

On October 4, 2006, the state supreme court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.* Ex. 17).

Petitioner filed the instant federal habeas corpus petition soon thereafter in November 2006.  (Doc. 2).[3]  In the petition, petitioner alleges eleven grounds for relief.

**Ground One:**  Appeals Court failed to allow redress after dismissal of ineffective appeals counsel.

**Ground Two:**  Appeals Court failed to fully consider the appellant's claims in a pro se petition to intervene, entered before dismissal of ineffective counsel.

**Ground Three:**  Appellant was denied the right to a public and entirely

---

[3]The petition, which was signed by petitioner and stamped as "received" by the Court on November 1, 2006, was officially filed on November 6, 2006.  (*See* Doc. 2).

6

open trial.

**Ground Four:** Trial judge failed to recuse himself due to prejudice and family relationship to the victim.

**Ground Five:** Prosecution failed to enter known exculpatory evidence[].

**Ground Six:** Crime scene detectives are related to the victim, with proof of evidence tampering and p[e]rjury by cop.

**Ground Seven:** Trial court erred in ordering appellant to wear handcuffs and shackles during trial.

**Ground Eight:** Trial court erred in abuse of discretion in failing to provide an instruction on reckless homicide or voluntary manslaughter.

**Ground Nine:** Appellant suffered ineffective trial counsel, for counsel's senseless disregard in permitting appellant's prior bad acts to be introduced at trial.

**Ground Ten:** Appellant suffered violations of manifold U.S. constitutional rights, and cum[u]lative effect of all errors.

**Ground Eleven:** The true cause of death was not fully explored by any party before []or during trial.

(*Id.,* pp. 6-7(D)).

It appears clear from the record that the instant petition is timely filed, and petitioner has exhausted all available state court remedies.  In the return of writ, respondent contends that petitioner has waived some of the claims asserted in the petition due to his procedural defaults in the state courts. (Doc. 25, Brief, pp. 19-22). Respondent also argues that each of petitioner's claims for relief should be denied as lacking in merit. (*Id.,* pp. 22-57).

# OPINION

## A. Petitioner Has Waived The Claims Alleged In Grounds Three, Five, Eleven And A Portion Of Ground Eight Due To His Procedural Defaults In The State Courts

In the return of writ, respondent contends that petitioner has waived the claims alleged in Grounds Three and Five, as well as the portion of Ground Eight alleging that the jury should have been instructed on the lesser offense of "reckless homicide," because petitioner failed to properly raise these claims to the Ohio Court of Appeals on direct appeal. (Doc. 25, Brief, p. 19). In addition, respondent argues that petitioner has waived the claim alleged in Ground Eleven, which was never presented to the Ohio courts for consideration. (*Id.*).[4]

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c)*; see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See*

---

[4]Respondent also contends that the claim alleged in Ground Seven, challenging the use of shackles and handcuffs on petitioner during his jury trial, is waived because such claim was only reviewed for "plain error" on direct appeal due to defense counsel's failure to lodge a formal objection at trial. (*See* Doc. 25, Brief, p. 20). Petitioner, however, argued in a separate assignment of error that his trial counsel was ineffective in failing to object to the use of restraints during the trial. (*See id.,* Ex. 5, pp. 16-17). The Ohio Court of Appeals summarily overruled the ineffective assistance claim because, based on its reasoning in rejecting the underlying claim challenging the use of restraints at trial, petitioner had failed to demonstrate counsel's error prejudiced the defense as required under *Strickland v. Washington,* 466 U.S. 668 (1984). (*See id.,* Ex. 10, pp. 17-19). As discussed *infra* pp. 38-39, this Court is not persuaded by the Ohio Court of Appeals' reasoning in rejecting these claims of error that were raised on direct appeal. Because ineffective assistance of counsel may constitute "cause" for a procedural default, *see Murray v. Carrier,* 477 U.S. 478, 488-89 (1986), it appears that the underlying merits of the claim alleged in Ground Seven must be addressed in any event. Therefore, the Court assumes, without deciding, that petitioner has not waived the claim of constitutional error alleged in Ground Seven of the petition.

8

*O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present his claims through the requisite levels of state appellate review to the state's highest court or commits some other procedural default relied on to preclude review of the merits of the claims by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, his claims for habeas corpus relief are subject to dismissal with prejudice on the ground that they are waived. *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If, because of a procedural default, petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, he has waived the claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as petitioner has conceded in his "traverse" brief (*see* Doc. 33, pp. 12-13), petitioner committed a procedural default with respect to the claim alleged in Ground Eleven of the petition, because he never raised it to the state appellate courts for their consideration.[5] Petitioner also committed procedural defaults with respect to the claims alleged in Grounds Three and Five and the portion of Ground Eight pertaining to the lesser offense of "reckless homicide," which were not properly raised

---

[5]Petitioner states in his "traverse" brief that he raised the claim in a state post-conviction petition, which had not been ruled on by the trial court at the time of his "appeals." (*See* Doc. 33, p. 12). No such pleading has been found in the voluminous record submitted and supplemented by petitioner in the instant action. The Court has reviewed the trial court's docket record available on the internet, which merely reflects that on November 15, 2006, the trial court denied a motion for modification of sentence/conviction. To the extent petitioner may have raised the claim alleged in Ground Eleven in that motion, he committed a procedural default because he did not appeal the November 15, 2006 ruling to the Ohio Court of Appeals.

to and thus were not considered by the Ohio Court of Appeals on direct appeal. Although he did assert these claims on further appeal to the Ohio Supreme Court, that court lacked jurisdiction to consider such claims which had not been heard below.  *See Leroy,* 757 F.2d at 99; *Fornash v. Marshall,* 686 F.2d 1179, 1185 n.7 (6th Cir. 1982), *cert. denied,* 460 U.S. 1042 (1983); *see also* Ohio Const. art. IV, § 2(B)(2); *State v. Jones,* 211 N.E.2d 198, 199 (Ohio 1965), *cert. denied,* 383 U.S. 918, 951 (1966).

Petitioner has argued that he did present the claim that he was denied the right to a public and open trial, which is alleged in Ground Three of the petition, to the Ohio Court of Appeals as an additional assignment of error by way of a "Supplement" to his *pro se* brief after he sought and obtained the dismissal of his appellate counsel. The Court of Appeals, however, denied petitioner's motion requesting an extension of time "to effectuate [his] pro se status" and to supplement his brief.  (*See* Doc. 25, Ex. 24).[6]   In a later separate entry, the court further ordered that petitioner's "supplement to his brief," which was filed on February 14, 2006, the same date his request for extension was denied, "is STRICKEN from the record and will not be considered by this court."  (*Id.,* Ex. 28; *see also id.,* Ex. 12, p. 5).

Thereafter, petitioner filed a motion requesting the appellate court's "en banc" review of the "stricken" Assignment of Error Eight.  (*Id.,* Ex. 29).  On March 23, 2005, an administrative judge of the Ohio Court of Appeals denied the motion, reasoning in pertinent part as follows:

> Neither the Ohio Rules of Appellate Procedure nor this court's local rules provide for the relief appellant has requested.  Moreover, striking the additional assignment of error in no way infringes on appellant's right to represent himself.  At the time appellant asked to dismiss his court-appointed counsel, briefing in this case had concluded.  Also, on

---

[6]It is noted that in its December 15, 2005 Order granting petitioner's "Pro Se Petition To Intervene and Amend In: Brief of Appellant," the Ohio Court of Appeals expressly informed petitioner that unless he "notifies us that he no longer wishes to have counsel, any future motions he files pro se will not be considered by this court."  (Doc. 25, Ex. 8).  As the Ohio Court of Appeals pointed out in a later Order denying petitioner's application for reopening of the appeal, petitioner "did not seek to dismiss his court appointed counsel and proceed pro se until 47 days later, on January 31, 2006."  (*Id.,* Ex. 12, p. 4).  Although the court granted petitioner's request to proceed *pro se,* his motion for extension of time to supplement the record also filed on January 31, 2006 was denied, "because briefing had already concluded."  (*See id.,* pp. 4-5).

December 15, 2005, we permitted appellant to amend the brief filed by his previous attorney to include additional issues for consideration. If appellant wanted other matters to be considered, he should have indic[a]ted so at that time.

(*Id.,* Ex. 30).

It is well-settled that on federal habeas corpus review, a court may be barred from considering an issue of federal law from a judgment of a state court if the state judgment rests on a state-law ground that is both "independent" of the merits of the federal claim and an "adequate" basis for the state court's decision. *Harris,* 489 U.S. at 260-62. The "adequate and independent state ground" doctrine has been applied to state decisions refusing to address the merits of a federal claim because of violations of state procedural rules. *Id.* at 261; *Sykes,* 433 U.S. at 86-87; *see also McBee,* 763 F.2d at 813.

Such a procedural default does not bar consideration of the federal claim unless the last state court rendering a judgment in the case "clearly and expressly" states that its judgment rests on the state procedural bar. *Harris,* 489 U.S. at 263. In cases where the last state court to render a reasoned opinion on the claim explicitly relies on a procedural bar, the court will presume that a later unexplained order did not silently disregard the procedural default and consider the merits of the claim. *Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991).

In addition, the rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied on by the state courts is deemed "adequate" or, in other words, involves a "firmly established and regularly followed state practice" at the time that it was applied. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.) (citing *White v. Schotten,* 201 F.3d 743, 751 (6th Cir.), *cert. denied,* 531 U.S. 940 (2000)), *rev'd on other grounds,* 546 U.S. 74 (2005) (per curiam); *Warner v. United States,* 975 F.2d 1207, 1213 (6th Cir. 1992), *cert. denied,* 507 U.S. 932 (1993).

Here, the Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing petitioner's "Supplement" to his *pro se* appellate brief, clearly and expressly refused to consider the supplement and thus the claim alleged in Ground Three of the petition because of petitioner's default in failing to raise the

claim earlier before the briefing period had concluded.  The court's refusal to permit the belated submission of an additional *pro se* assignment of error is based on an adequate and independent state ground.

Because petitioner thus failed to provide the state courts with the opportunity to correct the errors alleged in Grounds Three, Five, Eleven, and the portion of Ground Eight pertaining to the lesser offense of "reckless homicide," he has waived such claims absent a showing of cause for his defaults and actual prejudice as a result of the alleged errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice."  *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner has not provided any explanation as "cause" for his procedural defaults in the state courts.  To the extent petitioner argues his appellate counsel was ineffective in failing to raise the claim alleged in Ground Three of the petition on direct appeal, he has not set forth any justification for his own failure to assert the claim as an assignment of error in his *pro se* brief filed December 7, 2005 that was permitted and considered by the Ohio Court of Appeals.  In any event, as the Ohio Court of Appeals reasonably determined in denying petitioner's application for reopening based on the allegation that appellate counsel should have raised the "stricken" eighth assignment of error on appeal, there is no evidence in the record supporting petitioner's claim alleged in Ground Three that he was denied an open and public trial; therefore, petitioner has not shown "how the omission of this additional assignment of error prejudiced the appeal."  (*See* Doc. 25, Ex. 12, pp. 5-6).

Finally, petitioner has not demonstrated that a "fundamental miscarriage of justice" will occur, or in other words, that the alleged constitutional violations "probably resulted in the conviction of one who is actually innocent" of the crime charged, if the defaulted claims are not considered on the merits herein.  *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *cf. Souter v. Jones,* 395 F.3d 577, 597-602 (6th Cir. 2005).

Accordingly, in sum, the Court concludes that petitioner has waived the claims alleged in Grounds Three, Five, Eleven and the portion of Ground Eight pertaining to the lesser offense of "reckless homicide."  The claims, which are thus barred from review by this Court, are subject to dismissal with prejudice.

**B.  Petitioner Is Not Entitled To Relief Based On His Claims Alleged In Grounds One And Two Challenging The State Direct Appeal Proceeding**

In Ground One of the petition, petitioner alleges the Ohio Court of Appeals violated his constitutional rights to represent himself and to conduct his own defense when it refused to allow him to file *pro se* Assignment of Error Eight after he dismissed his appellate counsel.  (Doc. 2, p. 6).  In Ground Two, petitioner further claims that his constitutional rights were violated because the Ohio Court of Appeals failed to address his claims of evidence-tampering and perjury by the police, which he raised in his *pro se* brief that the court allowed him to file on appeal.  (*Id.,* p. 7(A)).

There is no evidentiary basis for either of these grounds for relief.  With respect to the claim alleged in Ground One, it is clear from the record that contrary to petitioner's contention, petitioner was permitted to represent himself on appeal. Indeed, even while he was represented by counsel, the Ohio Court of Appeals allowed him to file a *pro se* pleading raising additional assignments of error to those asserted by his appellate attorney.  (*See* Doc. 25, Exs. 7-8).  The Ohio Court of Appeals advised petitioner at that time that, because he was represented by counsel, any future *pro se* motions would not be considered absent notification by petitioner that "he no longer wishes to have counsel." (*Id.,* Ex. 8). When petitioner thereafter filed a motion on January 31, 2006 requesting the dismissal of his court-appointed counsel and that he be permitted to proceed *pro se,* his motion was granted.  (*Id.,* Ex. 24).

As petitioner has pointed out, the Ohio Court of Appeals refused to grant him an extension of time to file a supplement or to consider his subsequently-filed motion requesting that *pro se* Assignment of Error Eight be added as a claim of error for review on appeal.  (*Id.,* Exs. 24, 28; *see also id.,* Ex. 12, pp. 4-5).  However, by the time petitioner sought the extension of time and requested leave to add yet another *pro se* assignment of error for consideration on appeal, the briefing period had already concluded.   As the Ohio Court of Appeals reasonably determined in denying petitioner's motion for "en banc" review of the "stricken" claim, petitioner's right to represent himself was not infringed by the court's refusal to consider petitioner's belated submission; petitioner was permitted "to amend the brief filed by his previous attorney to include additional matters for consideration," and "[i]f [he] wanted other matters to be considered, he should have indic[a]ted so at that time." (*See id.,* Ex. 30).

Finally, with respect to the claim alleged in Ground Two, it is clear from the record that contrary to petitioner's contention, the Ohio Court of Appeals did in fact

13

consider his claims of evidence-tampering and perjury by the police. The Court of Appeals rejected these claims because there was no evidence in the record to support them. (*See id.*, Ex. 10, pp. 30-32).

Accordingly, the Court concludes that petitioner is not entitled to relief based on the claims of error purportedly committed by the Ohio Court of Appeals in the direct appeal proceedings, as alleged in Grounds One and Two of the petition.

## C. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Of Judicial Bias Alleged In Ground Four Of The Petition

In Ground Four of the petition, petitioner claims he is entitled to habeas relief because the trial judge, who had a "family relationship to the victim" and was prejudiced against petitioner, failed to recuse himself. (Doc. 2, p. 7(A)).

It appears from the record that petitioner filed a motion for the judge's recusal prior to trial. At a pretrial hearing, the following colloquy occurred regarding the motion, which was overruled:

> [DEFENSE COUNSEL]: . . . .In regards to the Motion to Recuse. It is the Defendant's position that the Judge, being yourself, and not to take anything personally, that you, yourself, somehow, are related to the [victim's] family. . . .
>
> THE COURT: This Court has no relation to the family.
>
> DEFENDANT: If nothing else, by strong affinity.
>
> [DEFENSE COUNSEL]: –and in regards to he believes that you have a strong connection to the [victim's] family . . . and that due to the previous rulings on different motions and things in this case and including and up into . . . the motions here today Mr. Evans believes that he would not interpret your actions or yourself as being unbiased in this matter and able to preside over the proceedings in an impartial manner and, therefore, Mr. Evans would suffer prejudice and would ask that you would be recused from this matter. . . .
>
> THE COURT: I am not the tr[ie]r of fact in this case. The jury will

14

determine the facts in this case and I assure you that you will have a level playing ground as there has never been anybody that has left this courtroom after a jury trial that didn't say that I played right down the middle and that is exactly as I will do in this case. . . .

\*\*\*\*

This judge is not related to the [victim's] family in any manner. I can't even tell the difference between the two boys, Dan and what's the other one's name?

[DEFENSE COUNSEL]: Dave.

THE COURT: I don't feel, there is no connection between me and the [victim's] family whatsoever I can assure you of that. And, again, you will get a fair, level playing ground as I provide to everybody at a jury trial. Both side[s] will be treated equally. I can assure you of that and I am not going to recuse myself at this time. . . .

(Doc. 25, Ex. 31, Tr. 19-21).

The Ohio Court of Appeals, which was the last state court to issue a reasoned decision addressing petitioner's claim of judicial bias, upheld the trial court's ruling as follows:

Nothing in the record supports the argument that the trial court judge was biased because of an alleged relation to the victim's family or law enforcement officers. In fact, the trial court judge announced that he had no relation to the victim's family.

(*Id.,* Ex. 10, p. 31).

As petitioner apparently understands, the Due Process Clause requires "a fair trial in a fair tribunal," *Withrow v. Larkin,* 421 U.S. 35, 46 (1975), "before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 905 (1997) (citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821-22 (1986), and *Tumey v. Ohio,* 273 U.S. 510, 523 (1927)).

15

The undersigned has reviewed the entire transcript of the state trial proceeding and, like the Ohio Court of Appeals, can find no evidence in the record to support petitioner's claim of actual or even apparent bias on the part of the trial judge. The judge unequivocally stated before overruling the motion for his recusal that he had no connection to the victim's family and assured the defense that he would treat both sides equally and impartially. Although the judge ruled against petitioner on some matters, he also sustained many objections lodged by the defense. All rulings appear to have been made on the bases of legal principles, which were reasonably and impartially applied by the court to the particular facts of the case.

Accordingly, because there is no evidence in the record even remotely suggesting the trial judge was related to the victim's family or was otherwise prejudiced against petitioner, petitioner is not entitled to habeas relief based on his claim of judicial bias alleged in Ground Four of the petition.

### D.  Petitioner Is Not Entitled To Relief Based On His Claims Alleged In Ground Six Of Police Bias, Evidence-Tampering And Perjury

In Ground Six of the petition, petitioner claims that husband-and-wife police detectives Lynn and Debbie Brewer were related to the victim and, together with other police officers who responded to the crime scene, engaged in evidence-tampering and perjury. (Doc. 2, p. 7(B)). In support of this claim, petitioner suggests that the investigating police officers tampered with the victim's body by placing strands of hair in the victim's hand, as well as red marks on her neck between the time she was photographed at the crime scene and the time she was photographed at the coroner's office. (*Id.*). Petitioner also contends that State witnesses Norb Cassidy, James Charles and Debbie Brewer falsely testified at trial that Lynn Brewer neither was present at the crime scene nor participated in the criminal investigation. (*Id.*, pp. 7(B)-(C)). Finally, although not specifically alleged in Ground Six, petitioner has argued that the police officers allowed the victim's family to collect from the crime scene the "shop-vac," which he claimed the victim had thrown at him, and failed to conduct any testing on it for "traces of [his] blood." (*Id.*, p. 7(B)).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing these claims of error on the merits. The court found there was "nothing in the record" to support petitioner's "arguments (1) that someone tampered with the crime scene by placing hairs in the victim's hand, or (2) that the victim's body must have been tampered with because crime scene photos did not show red marks on her

neck but the coroner's photos did." (Doc. 25, Ex. 10, pp. 31-32). The court further found no evidence in the record to support petitioner's claim of bias on the part of the investigating police officers. (*Id.*, p. 32). Finally, the court rejected as "meritless" the claim that "law enforcement officers did not properly process the crime scene because they did not test a shop-vac for traces of blood." (*Id.*). The court reasoned:

> The investigating officer stated that he did not observe anything of evidentiary value on the shop-vac. Thus, he possessed no reason to test it and Evans cannot show that the officers failed to properly process the crime scene.

(*Id.*).

This Court agrees with the state appellate court's finding that there is no evidence in the record even remotely suggesting that the Brewers, or any of the investigating police officers, were related to the victim or her family or that the investigating officers tampered with the victim's body or other evidence obtained from the crime scene.[7]

Petitioner exclaimed at one point in the trial, after the State rested and defense counsel called him to the stand to testify in his defense, that "[p]erjury and crime scene (unintelligible) has taken place during this whole trial and I can prove it right now." (*Id.,* Ex. 36, Tr. 380). Petitioner further accused both his attorneys of assisting "in this cover-up situation," reiterated his claim of judicial bias, and went on to state in response to the trial court's question as to whether he was going to take the witness stand, that "Lynn Brewer is related and they stated that he didn't have no part in it for a reason because he did tamper with the evidence." (*Id.*). Petitioner refused to take the witness stand to testify under oath. (*Id.,* Tr. 381). Petitioner's self-serving, conclusory and unsubstantiated accusations of perjury, evidence-tampering, and bias

---

[7]Indeed, contrary to petitioner's contention that red marks were added to the victim's neck after the initial crime scene photographs were taken, James Charles testified at trial that a photograph taken of the victim at the scene reflected "quite a bit of discoloration around her neck here." (Doc. 25, Ex. 34, Tr. 69). Moreover, petitioner's claim that police officers planted three strands of hair in the victim's hand after-the-fact is discredited by Charles's testimony, which was corroborated by a photograph he took at the crime scene, that when he opened the victim's hand from an "almost closed position" to take the picture, he found "three, hairs that were attached, actually almost stuck in the dried blood that was on her hand." (*Id.,* Tr. 72).

17

not only on the part of the police officers but also on the part of defense counsel and the trial judge, which were not made under oath from the witness stand, are insufficient to give rise to an actionable claim.

Petitioner also has not demonstrated that State witnesses Debbie Brewer, James Charles or Norb Cassidy lied, or indeed had any reason to lie, at trial regarding Lynn Brewer's lack of participation in the criminal investigation. Upon review of the trial transcript, the Court could find no reference to Lynn Brewer by Norb Cassidy, who was not significantly involved in the investigation at the crime scene, but rather at the police station where he interviewed petitioner and ultimately obtained his confession. Debbie Brewer, who did respond to both the victim's initial 911 call and the second 911 call made by a neighbor, testified only that her husband Lynn was not "there that night," but that she did call him about the case and he "in turn called out Sgt. Charles, Detective Cassidy, and Detective Crapyou." (*Id.*, Ex. 34, Tr. 45). There is no evidence in the record to suggest that this testimony is false.

To the extent petitioner further claims James Charles lied about Lynn Brewer's participation in the criminal investigation, Charles merely responded, "That's correct," when defense counsel asked the following leading question on cross-examination: "And, he [Lynn Brewer] was not working that night or he didn't have anything to do with the investigation of this case?" (*Id.*, Tr. 114). Again, there is no evidence in the record to suggest that this statement amounts to perjury. Petitioner has submitted documents indicating that Lynn Brewer, who was Charles's immediate supervisor, initialed a report addressed to Charles from the Ohio Bureau of Criminal Identification and Investigation regarding certain items submitted by Charles for DNA testing; that Brewer participated in the search of petitioner's home at 9:09 a.m. on August 11, 2004; and that Brewer assisted with the press release issued on August 11, 2004. (*See* Doc. 1, Exs. F-H). Even assuming this evidence is inconsistent with Charles's testimony to the extent Charles agreed that Lynn "didn't have anything to do with the investigation of this case," it does not mean that Charles, who was listed as the "Contact Person" in the press release and was the "lead" officer in charge of the investigation (*see* Doc. 25, Ex. 34, Tr. 119), intentionally presented false testimony.

Finally, as the Ohio Court of Appeals reasonably determined on direct appeal, the record does not support petitioner's claim stemming from the police officers' failure to secure and test the shop-vac, which petitioner had asserted was thrown at him during the altercation that resulted in the victim's death. Police Officer Charles testified that as he was processing and taking photographs of the crime scene, it did

18

not appear to him that the shop-vac, which did "not look disturbed," had "anything to do with the altercation" between petitioner and the victim. (*Id.,* Tr. 121). He said he examined the shop-vac, which weighed approximately ten to thirteen pounds, and "saw nothing of evidentiary value" inside the vacuum cleaner bag or "on the outside" of it, such as blood, body tissue or damage to the shop-vac's exterior. (*Id.,* Tr. 121, 129-30). To the extent petitioner claims the shop-vac has evidentiary value because the victim threw it at him during their altercation, petitioner himself stated to the police that this incident took place before the victim's initial 911 call, which police responded to at approximately 1:50 a.m. The victim was killed around one hour later, long after the altercation involving the shop-vac had occurred.

Accordingly, in sum, the Court concludes that petitioner is not entitled to habeas relief based on the claims alleged in Ground Six of the petition because petitioner has not shown that his allegations of police bias, evidence-tampering and perjury have any bases in fact.

### E. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Eight Of The Petition Challenging The Trial Court's Refusal To Give Instructions On Voluntary Manslaughter As Requested By Petitioner

In Ground Eight of the petition, petitioner alleges that the trial court abused its discretion when it denied his request for jury instructions on the lesser offense of voluntary manslaughter, and that due process was violated because "only one option" for conviction–i.e., murder–was presented to the jury. (Doc. 2, pp. 7(C)-(D)). As derived from pleadings filed on direct appeal in the state courts, it is petitioner's position that sufficient evidence of "provocation" was introduced at trial to warrant an instruction on voluntary manslaughter. (*See* Doc. 25, Ex. 5, pp. 18-19). Specifically, petitioner relies on evidence that he and the victim had been drinking beer throughout the entire day; that he and the victim, who was argumentative when she drank, started off the day arguing; and that during the course of their argument, the victim hit and kicked petitioner, as well as threw a shop-vac at him, causing a bruise. (*See id.*).

The trial court denied petitioner's request for the jury instructions after determining that the evidence admitted at trial was insufficient to raise a question that petitioner acted under the influence of a "sudden fit of rage . . . brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." (Doc. 25, Ex. 36, Tr. 370). On direct appeal, the Ohio

Court of Appeals affirmed the trial court's decision, reasoning in relevant part as follows:

> Generally, a trial court has broad discretion in deciding how to fashion jury instructions. The trial court must not, however, fail to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." . . . Additionally, a trial court may not omit a requested instruction, if it is "'a correct, pertinent statement of the law and [is] appropriate to the facts ***.'" . . .

> In determining whether to give a requested instruction, a trial court may inquire into the sufficiency of evidence to support the requested instruction. . . . A trial court is vested with discretion to determine whether sufficient evidence was presented at trial to require a particular jury instruction. . . . If, however, the evidence does not warrant an instruction or if an instruction is not appropriate in light of the crime charged, the trial court is not obligated to give the instruction. . . . Thus, in our review we must determine whether the trial court abused its discretion by finding that the evidence was sufficient to support the requested charge or that the requested instruction was pertinent to the crime charged. . . . A trial court abuses its discretion if the trial court's attitude was unreasonable, arbitrary or unconscionable. . . .

> R.C. 2903.03 defines voluntary manslaughter and states that "[n]o person while under the influence of sudden passion or in a sudden fit of rage *** shall knowingly cause the death of another." A defendant is entitled to a voluntary manslaughter instruction "when the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." . . . Otherwise, the trial court is not required to give the voluntary manslaughter instruction....

> A trial court need not give a voluntary manslaughter instruction unless sufficient evidence shows that the defendant acted under the influence of sudden passion or in a sudden fit of rage. . . . To determine whether sufficient evidence of sudden passion or fit of rage exists, a trial court must employ a two-part inquiry. First, the court must objectively

20

determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. . . .  "If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case 'actually was under the influence of sudden passion or in a sudden fit of rage.'" . . .  "[T]he provocation must be 'sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" . . .

In [one Ohio case], the court determined that the provocation was not reasonably sufficient to bring on sudden passion or a fit of rage.  The court concluded, as a matter of law, that a stormy relationship between the parties and the victim's alleged bumping of the defendant's car did not constitute sufficient provocation.  Subsequent cases have likewise held that a victim's pushing or punching does not constitute sufficient provocation. . . .

In the case at bar, the evidence does not sufficiently show that the victim seriously provoked Evans so as to cause a sudden fit of passion or rage.  As a matter of law, hitting another person does not constitute sufficient provocation to bring about a sudden passion or fit of rage.  Furthermore, Evans' contention that the victim's throwing of a shop-vac at him constitutes sufficient provocation is unavailing.  Evans admits that after the victim hit him with the shop-vac, he left the residence.  Thus, any provocation that may have existed dissipated once he left the residence.  Upon his return, the victim's "smacks" did not constitute sufficient provocation.  Because Evans cannot show that the victim's alleged provocation was reasonably sufficient to bring on a sudden fit of passion or fit of rage, he is not entitled to a voluntary manslaughter instruction.

(*Id.,* Ex. 10, pp. 22-25) (state case citations omitted).

As an initial matter, to the extent petitioner claims he is entitled to relief because the trial court committed error or otherwise abused its discretion under Ohio law in deciding whether or not to give an instruction on voluntary manslaughter, he raises issues of state law only that are not cognizable in this federal habeas corpus proceeding.  A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C.

§ 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").

Turning to the constitutional issue, the United States Supreme Court held in *Beck v. Alabama,* 447 U.S. 625 (1980), that a defendant in a capital murder case has a constitutional right to have the jury instructed on a lesser included offense in certain situations. *Beck,* 447 U.S. at 638. When a jury is given only two options, "not guilty" and "guilty of capital murder," the risk that the jury will convict when it has reasonable doubt is too great; therefore, in that limited context, a lesser-included non-capital offense instruction is required when there is evidence to support it. *Id.* The Court in *Beck* expressly declined to decide "whether the Due Process Clause would require the giving of such instruction in a non-capital case." *Id.* at 638 n.7.

To date, the Supreme Court has not held that due process requires the giving of a lesser-included offense instruction in a non-capital case. *See Scott v. Elo,* 302 F.3d 598, 606 (6th Cir. 2002), *cert. denied,* 537 U.S. 1192 (2003). The United States Court of Appeals for the Sixth Circuit has interpreted *Beck* to mean that "the Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc)); *see also Scott*, 302 F.3d at 606; *cf. Kuroda v. Bell,* No. 2:07cv12310, 2007 WL 1657410, at *2 (E.D. Mich. June 7, 2007) (holding under *Hopkins v. Reeves,* 524 U.S. 88, 90-91 (1998), that "even in capital cases, there is no constitutional right to a jury instruction if the requested charge does not meet the legal definition of a lesser included offense").

In *Bagby*, the Sixth Circuit refused to extend *Beck* to the non-capital context on federal habeas corpus review of a state conviction, reasoning as follows:

> It appears to us that the Supreme Court's opinion in *Beck* is grounded upon Eighth Amendment concerns, rather than those arising from the Due Process Clause of the Fourteenth Amendment. If we are correct in that assessment, then we are not required to extend *Beck* to noncapital cases. Instead, we must determine whether the error asserted by Bagby is of the character or magnitude which should be cognizable on collateral attack. Is the failure to instruct on lesser included offenses in noncapital cases such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with rudimentary demands of fair

22

procedure?... Experience tells us that it is not.

Our view, that it is not an error of such character and magnitude to be cognizable in federal habeas corpus review, is shared by a majority of the circuits. . . .

*Bagby,* 894 F.2d at 796-97 (citations omitted).

In *Bagby,* the court postulated that it was "conceivable" that certain claims might be cognizable on federal habeas review where "a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law." *Id.* at 795. The court emphasized, however, such occasions would occur only in the "most unusual circumstances," such as where the failure to give the instruction likely resulted in the conviction of an innocent person, because "it is not the function of a federal habeas court to correct errors in state law." *Id.*; *see also Todd v. Stegal,* 40 Fed.Appx. 25, 28 (6th Cir. Apr. 12, 2002) (not published in Federal Reporter), *cert. denied,* 537 U.S. 981 (2002).

Here, petitioner has not shown that this case involves "most unusual circumstances" where a fundamental miscarriage of justice has resulted from the arbitrary and unsupportable refusal of the trial court to give an instruction on a lesser-included offense in clear defiance of state law. In this case, the Ohio Court of Appeals upheld the trial court's determination that the evidence at trial did not support jury instructions on voluntary manslaughter. Where a state court has reviewed a habeas petitioner's request for a lesser-included offense instruction and concludes that it was not warranted by the evidence presented at trial, "that conclusion is axiomatically correct, as a matter of state law." *Bagby v. Sowders,* 894 F.2d at 795.

In any event, it was reasonable for the Ohio courts to find that the evidence that petitioner and the victim had been arguing and drinking, and that the 110-pound victim hit and possibly kicked petitioner a few times, was not sufficient to arouse the passions of an ordinary person beyond the power of his control. Moreover, it was reasonable for the court to give little weight to petitioner's claim that he was provoked into using deadly force because the victim had thrown a shop-vac at him. That incident, if it occurred at all, took place before the victim placed the initial 911 call for emergency assistance. At that point, petitioner ran from the house to avoid the police, who arrived around 1:50 a.m. in response to the call. As the Ohio Court of Appeals

23

concluded, any provocation that may have been created by the victim's throwing of the shop-vac ended when petitioner left the residence. The assault that caused the victim's death did not occur until at least one hour later, when petitioner returned to the house after the police spoke with the victim and secured and left the premises.

In light of the physical evidence of the crime scene, the autopsy evidence showing the victim was "massively beaten" and strangled, the coroner's testimony concerning the substantial injuries suffered by the victim at petitioner's hands, and the absence of any significant injury to petitioner, this Court concludes that the trial court's refusal to give an instruction on voluntary manslaughter does not implicate constitutional concerns. This is not the unusual case contemplated by *Bagby* where the failure to give a lesser-included offense instruction might have amounted to a fundamental miscarriage of justice that was likely to have resulted in the conviction of an innocent person. *See Bagby,* 894 F.2d at 795; *see also Scott,* 302 F.3d at 606.

Accordingly, petitioner is not entitled to habeas corpus relief based on the claim alleged in Ground Eight of the petition challenging the trial court's denial of his request for jury instructions on the lesser offense of voluntary manslaughter.

### F. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Nine That He Was Denied The Effective Assistance Of Trial Counsel

In Ground Nine of the petition, petitioner alleges that his trial attorneys were ineffective when the State introduced into evidence videotapes of petitioner's two interviews with police detective Norb Cassidy. (Doc. 2, p. 7(D)). Petitioner states that in those interviews, he made "numerous references" to his "prior convictions, pending criminal cases, and . . . previous prison and jail events." (*Id.*). Petitioner contends these references were heard by the jury because both his counsel who was operating the videotape player, Michael Mearan, and another defense attorney, Christine Scott, failed to prevent the disclosure of his prior "bad acts." (*Id.*).

The first videotape, identified at trial as State's Exhibit 105, recorded petitioner's initial two-hour interview with Cassidy at the Portsmouth police station, which began at approximately 4:48 a.m. on August 11, 2004. (*See* Doc. 25, Ex. 35, Tr. 202-03, 212). Before playing the tape before the jury, Mr. Mearan pointed out in a sidebar conference that "there is an area at the end of this first tape where Norb talks to him about his prison record and his past record, and that clearly is inadmissible and should not be a part of it." (*Id.,* Tr. 204). Mearan indicated that he would stop the

tape player and fast-forward the tape through that portion of the interview to prevent the jury from hearing the inadmissible information.  (*Id.,* Tr. 204-05).  He stated: "At least if it is messed up it's because of me."  (*Id.,* Tr. 205).

As the videotape of this interview was played before the jury, the jury heard petitioner state at one point  that the victim had "bonded [him] out of jail" when he was arrested for a DWI offense.  (*Id.,* Tr. 218-19).  Later in the interview, petitioner indicated in response to a question posed by Cassidy that he had been "locked up in prison."  (*Id.,* Tr. 231).   At that point, Mearan stopped and fast-forwarded the videotape to prevent any further information about that prior matter from being disclosed.  (*Id.,* Tr. 231-32).  Despite counsel's efforts, the jury did hear additional details–i.e., that petitioner was sent to prison on a domestic violence charge initiated by his former wife after nineteen years of marriage.  (*Id.,* Tr. 231-33).

Mearan again stopped and fast-forwarded the videotape to prevent the jury from hearing any more information about the prior domestic violence charge, but petitioner stated at that point: "I would just sort of like the jury to hear that.  I don't mind at all." (*Id.,* Tr. 233).  Immediately after petitioner made this statement, a sidebar conference was held, where the following colloquy took place:

> PROSECUTOR:  We were fast forwarding through a portion of the tape that we think is—
>
> THE COURT:  This is a problem—
>
> MR. MEARAN:  Well—
>
> PROSECUTOR:  When he is explaining the part about how he received the marks on his body, I think that is important for the jury to hear here.
>
> MS. SCOTT:  And just, I mean, I know that Mike [Mearan] has made you know a judgment call and an argument not to have it but—
>
> MR. MEARAN:  If we, if you want to go back to it that's fine, then tell to just disregard and then at the end we can just—
>
> THE COURT:  They have heard the word prison at least five times now.

MS. SCOTT:  And he doesn't, just to state from his preference and if we could, he doesn't mind if the whole tape is shown.

THE COURT:  Well, if you[r] client doesn't mind if the whole tape is shown—

MR. MEARAN:  Your Honor, I—

MS. SCOTT:  It's his judgment.

MR. MEARAN:  Your Honor, I am the lawyer.

****

THE COURT:  Well, this isn't working because when you turn that off and just fast forward blindly—

MR. MEARAN:  Well, that's fine, I don't mean to do that.  You—

PROSECUTOR:  Well, you are doing okay, Mike, but we just need to be sure that we get to the part where he talks about the marks.

THE COURT:  I believe that I at least have to give them an instruction that he has been to the penitentiary but it has nothing to do with the case, don't you, because I have heard the word at least—

MR. MEARAN:  You say you have heard the word prison—

MS. SCOTT:  And Domestic Violence.

****

THE COURT:  One thing about this, you can't just keep blindly fast-forwarding—

MR. MEARAN:  Well, here just play it.  Just play it.

THE COURT:  We will play the tape on through now.

26

MR. MEARAN:  Yeah.

\*\*\*\*

THE COURT:  And what do you want me to tell them?

MR. MEARAN: Just say that any reference in here to any prior incarcerations has nothing to do with this case.

\*\*\*\*

Just say that we don't have a means of cutting this out and if you hear anything just disregard it.

(*Id.*, Tr. 234-35).

Soon thereafter, the sidebar conference concluded, and the trial court gave the following instruction to the jury, which was approved by defense counsel, before resuming the playing of petitioner's videotaped police interrogation:

This obviously wasn't working the way it was going on now and references have been made to prior incarcerations.  That is not part of this case.  Okay, the only thing that is a part of this case is what you are hearing and any references that have been made to prior incarcerations are not to be considered for any purpose by you, okay. . . .

(*Id.,* Tr. 236).

Thereafter, the jury heard petitioner generally state on a number of occasions in the first videotaped interview that he had been incarcerated in the past.  No additional details came out about these prior incarcerations except that there was a "retaliation" charge pending against him for "running [his] mouth" at the police officer who arrested him on the DWI charge.  (*See id.,* Tr. 253-54).

The videotape of petitioner's second police interrogation, identified as State's Exhibit 106, was also played before the jury.  That interview, which was initiated by petitioner, commenced at 4:52 p.m. on August 11, 2004.  (*See* Doc. 36, Tr. 297-300). In that interview, petitioner admitted that he physically assaulted the victim, causing

her death, when he returned to her home after she made the initial 911 call to the police that night.  (*See id.,* Tr. 315-45).  During the course of this second interrogation, petitioner also made the following general remarks about his prior criminal history:  he had a "record" and was out "on bond;" women had called "the police on me and stuff so many times;" the victim "bonded me out;" and he had been "locked up" in jail "those first few days" after he and the victim became romantically involved.  (*Id.,* Tr. 307-08, 310, 314, 316-17).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's claim that his trial attorneys provided ineffective assistance in failing to ensure the statements contained in the videotaped police interviews regarding the prior "bad acts" would not be heard by the jury.  In addressing this claim, the court applied the two-part standard enunciated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), for assessing the merits of ineffective assistance of counsel claims.  (*See id.,* Ex. 10, pp. 17-18).  The court went on to point out that Ohio R. Evid. 404 limits the admissibility of "other acts evidence . . . because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment." (*Id.*, p. 20) (quoting *State v. Schaim,* 600 N.E.2d 661, 668 (Ohio 1992)).

The court rejected petitioner's ineffective assistance of counsel claim on the ground that counsel's allegedly deficient conduct did not prejudice the defense, as required under the second prong of the *Strickland* test.  The court reasoned in pertinent part:

> . . . .In light of the overwhelming evidence of Evans' guilt, i.e., he confessed, the evidence [regarding his prior incarcerations, arrests, and crimes] was not prejudicial.  Evans' assertion that "it is highly probable that the jurors would have acquitted" him of murder if they had not heard the evidence of his prior incarcerations, arrests, and crimes is specious, especially in light of his confession that he caused the victim's death.  Additionally, to the extent that he argues that the evidence affected the credibility of a voluntary manslaughter defense, the trial court did not allow a voluntary manslaughter instruction and thus it was not available for the jury to consider as a defense.
>
> Moreover, Evans expressed indifference as to whether the jury should

28

hear the evidence on the videotape of his prior arrests, incarcerations, and crimes.  He stated that he "would just sort of like the jury to hear that" and "I don't mind at all."  His trial counsel stated that Evans preferred that the jury hear the entire tape.

(*Id.,* p. 21).

Under the applicable standard of review set forth in 28 U.S.C. § 2254(d), petitioner is not entitled to relief in this federal habeas corpus proceeding unless the state court's adjudication of his ineffective assistance of counsel claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942; *see also Ruimveld v. Birkett,* 404 F.3d 1006, 1010 (6th Cir. 2005).

An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams,* 529 U.S. at 407-08 (O'Connor, J.).

Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411 (O'Connor, J.); *see also Bell v. Cone,* 535 U.S. 685, 694

(2002); *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942.

The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

In this case, the Ohio Court of Appeals correctly identified and applied the proper standard of review that was clearly established by the Supreme Court in *Strickland* for evaluating ineffective assistance of counsel claims. As the state court recognized (*see* Doc. 25, Ex. 10, pp. 17-18), in order to establish a Sixth Amendment violation under *Strickland*, the petitioner must demonstrate: (1) his attorney made such serious errors he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) his attorney's deficient performance prejudiced the defense by undermining the reliability of the trial result. *See Strickland,* 466 U.S. at 687.

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *See id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See id.*

In order to satisfy the second "prejudice" prong of the *Strickland* test, petitioner must demonstrate a "reasonable probability" exists that, but for his counsel's deficient conduct, the result of the trial and appeal proceedings would have been different. *See id.* at 694. Petitioner has met his burden if he shows that the result of his trial would "reasonably likely have been different absent the errors." *See id.* at 695.

The Court need not examine the question of whether counsel's performance was

deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *See id.* at 697.

Here, as the Ohio Court of Appeals reasonably determined, petitioner has not shown that his trial counsel's performance prejudiced the defense as required under the second prong of the *Strickland* test.[8] Although petitioner made numerous comments about his prior incarcerations and criminal record, most of the remarks were passing and revealed few details about the underlying offenses. The trial court expressly instructed the jury that it could not consider the prior acts evidence in determining petitioner's guilt or innocence in the case at hand. Moreover, as the Ohio Court of Appeals found, the evidence of guilt, which included petitioner's confession, was overwhelming. Therefore, petitioner has not shown a reasonable probability exists that the result of his trial would have been different if defense counsel had been able to prevent the jury from hearing the numerous passing references to his prior record, which were contained in the videotaped police interviews that were introduced into evidence at trial.

Accordingly, petitioner is not entitled to habeas relief based on the ineffective assistance of trial counsel claim alleged in Ground Nine of the petition.

---

[8]It is noted that although the Ohio Court of Appeals did not consider whether counsel's performance was "deficient" under the first prong of the *Strickland* test, a strong argument can be made that counsel's performance did not fall outside the wide range of reasonable professional assistance. Defense counsel was given an impossible task–to fast-forward the videotapes through petitioner's numerous passing remarks about his prior criminal record without editing out admissible relevant information also contained in those same statements which the State wanted the jury to hear. Counsel protected petitioner's interests as best they could under the circumstances by ensuring the court instructed the jury that the remarks pertaining to petitioner's prior acts could not be considered in determining petitioner's guilt or innocence on the murder charge before it. Because petitioner had indicated that he had no problem with the jury hearing the entirety of the videotapes, it was reasonable for counsel to agree with the court's proposal to play the videotapes without fast-forwarding through certain parts of the interrogations, but with limiting instructions.

### G. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Seven Challenging The Use Of Shackles And Handcuffs During Trial

In Ground Seven of the petition, petitioner contends that he was denied a fair trial when the trial court ordered him to wear shackles and handcuffs during the trial without making the requisite case-specific findings regarding their necessity. (Doc. 2, p. 7(C)).

The record reflects that at a pretrial hearing, the trial court brought up the issue of security and asked his bailiff, the Chief Probation Officer in charge of security, what he recommended. (Doc. 25, Ex. 32, Tr. 19). The officer responded that based on his "twenty-five years of experience in dealing with prisoners in the jail and the court procedures, I would ask this Court that the defendant be kept in leg irons, belt and handcuffs for the security of this court for the duration of this trial during all the proceedings." (*Id.*).

Defense counsel objected to the extent she stated that petitioner had indicated to her that he was "not going to flip," would "not try to assault anyone including his counsel and will not disrupt the proceedings." (*Id.*). The trial court responded as follows:

> In light of what has just happened with two different judgeships it is going to be this Court's policy hereinafter when anybody is charged with a violent offense they will have to wear what [the Chief Probation Officer] has suggested and I will, however, give the jury a cautionary instruction regarding the fact that he is shackled that they are not to hold that against him in any way.

(*Id.*).

When petitioner next asked the court to modify the restraint order "just a little bit and maybe minus the belt so that I can freely access my legal work and aid[] in my defense," the court responded: "Up until last week when that judge got killed in his courtroom, maybe, but I am just not going to do it any more. Okay, because the reason that judge got killed was he got his hands loose." (*Id.*, Tr. 20). Petitioner sought to assure the court he would not commit such an act. (*Id.*). However, the court interrupted petitioner, stating: "I am not saying that you would but I am just going to do it with everybody." (*Id.*).

It was at this point that the prosecutor stated, for "purposes of the record," that the State had provided the defense with reports from jail guards regarding certain statements made by petitioner, which involved "threats against killing deputies while he has been incarcerated on this matter." (*Id.*).

The next day, before prospective jurors were brought in for voir dire, the court stated on the record that the petitioner was wearing the court-ordered restraints for security. (*Id.,* Ex. 34, Tr. 5). The court indicated that the restraints ordered for security reasons were not related to petitioner in particular, but were made in "reference . . . to recent events." (*Id.*). In addition, petitioner confirmed on the record that he had chosen to wear "prison garb" at his trial. (*Id.,* Tr. 8).

Later, after the jury was impaneled and before the defense gave its opening statement, the court instructed the jury as follows:

> . . . . The fact that Mr. Evans is wearing handcuffs in no way implies his guilt. This is just a courtroom security issue. Whenever anybody is charged with any crime of violence. [A]nd you are to presume that he is innocent. [I]t is just a matter of courtroom security for the safety of everybody, okay. So disregard the fact that he is wearing handcuffs, okay....

(*Id.,* Tr. 23).

On direct appeal, petitioner argued that in the absence of a hearing on the need for restraints or any findings specifically related to petitioner supporting the use of restraints during trial, the trial court's order approving the shackling and handcuffing of petitioner constituted "plain error." (*Id.,* Ex. 5, pp. 10-15). Petitioner further contended that his trial counsel's failure to lodge a formal objection to the use of these restraints at trial also amounted to "plain error." (*See id.,* p . 10).

The Ohio Court of Appeals determined that the trial court erred by ordering petitioner to be restrained without citing "circumstances demonstrating a compelling need for restraining Evans, beyond the violent nature of the crime." (*Id.,* Ex. 10, p. 15). The court, however, further held that the error did not amount to "plain error" because petitioner was not prejudiced by it. (*Id.*). The court reasoned:

> Evans chose to wear prison attire during his trial. Prison attire carries a

33

similar indicia of guilt as restraints. When a defendant is forced to appear before the jury in prison clothes, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Holbrook v. Flynn* (1986), 475 U.S. 560, 568 . . ., quoting *Estelle v. Williams* (1976), 425 U.S. 501, 504-5. . . . Being compelled to wear prison or jail clothing, like being restrained, erodes the presumption of innocence. . . .

Evans' decision to wear prison attire had already eroded the presumption of innocence and Evans has not shown that the use of restraints further eroded that presumption. Once Evans chose to permit the jury to see him in prison attire, the damage was done. Thus, the court's error in ordering him restrained during trial did not seriously affect the fairness of the proceedings and does not constitute plain error.

(*Id.,* p. 16).[9]

This Court begins its analysis of petitioner's claim by recognizing that subjecting a criminal defendant to visible physical restraints during his criminal trial implicates his right to a fair and impartial trial. In *Deck v. Missouri,* 544 U.S. 622 (2005), the Supreme Court held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is justified by an essential state interest–as the interest in courtroom security–specific to the defendant." *Id.* at 624 (emphasis in the original). This rule prohibiting the use of visible restraints on a criminal defendant during the guilt phase absent extraordinary circumstances is premised on long-established Supreme Court precedent. *See id.* at 627-29; *McKaskle v. Wiggins,* 465 U.S. 168, 188 (1984) (a state defendant "may not normally be forced to appear in court in shackles"); *Illinois v. Allen,* 397 U.S. 337, 344 (1970) (holding that "no defendant should be tried while shackled and gagged except as a last resort").[10] *See also Lakin v. Stine,* 431 F.3d 959,

_____

[9]Based on these same reasons, the Ohio Court of Appeals also found that petitioner's trial counsel was not ineffective in failing to object to the shackling and handcuffing of petitioner during trial. (*See* Doc. 25, Ex. 10, pp. 18-19).

[10]*Cf. Holbrook v. Flynn,* 475 U.S. 560, 568-69 (1986) (holding that requiring a criminal defendant to wear a prison uniform in front of the jury is "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial"); *Estelle v. Williams,* 425 U.S. 501, 505 (1976) (holding that

963 (6th Cir. 2005) ("[T]he principle that shackling a defendant at trial without the individualized determination as to necessity violates the due process clause was clearly established long before *Deck* was decided."), *cert. denied,* 547 U.S. 1118 (2006); *Kennedy v. Cardwell,* 487 F.2d 101 (6th Cir. 1973), *cert. denied*, 416 U.S. 959 (1974) (recognizing inherent prejudice to a defendant required to be manacled or shackled while in the courtroom during his trial).

In *Allen*, 397 U.S. at 344, the Supreme Court reasoned that the sight of physical restraints can have a significant prejudicial effect on the jury. Indeed, as the Sixth Circuit has pointed out:

> There can be little question that the holdings of the Supreme Court reflect a strong concern that trial practices such as shackling can have substantial or injurious influences on jury verdicts. The holdings in *Estelle* and *Holbrook*, especially, effectively state that indicia of guilt, such as shackles, impose a significant level of harm upon the presumption of innocence, and that the injurious influence of such harm can only be overcome by a confident finding that the indicia were warranted or that the outcome of the defendant's case was not affected.

*Ruimveld v. Birkett*, 404 F.3d 1006, 1014 (6th Cir. 2005) (citing *Estelle v. Williams*, 425 U.S. 501, 512-13 (1976); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986)).

Therefore, as the Ohio Court of Appeals recognized in the instant case (*see* Doc. 25, Ex. 10, pp. 14-15), "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629.

The Sixth Circuit has specified certain factors to be considered by trial courts in making shackling decisions, which include:

> (1) the defendant's record, his temperament, and the desperateness of his

---

defendants may not be presented to the jury in prison-issue clothing so that "an unacceptable risk is presented of impermissible factors coming into play" where to do so "furthers no essential state policy").

> situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security.

*Lakin,* 431 F.3d at 964 (citing *Kennedy,* 487 F.2d at 110-11).

> Although a trial court might find a corrections officer's opinion highly relevant to answering the ultimate inquiry as to whether shackling is necessary in a particular case, an individualized determination under the due process clause requires more than rubber stamping that request.  A corrections officer's preference does not excuse the . . . court from conducting the appropriate inquiry.  Nor does the convenience of shackling a defendant justify its use. . . .

*Id.*  In addition, the "nature of the charges against a particular defendant cannot themselves provide the entire justification for shackling; rather, all of the relevant factors must be considered, including alternative means of provid[ing] a safe and fair trial."  *Id.* at 965.

In this case, the undersigned agrees with the Ohio Court of Appeals' determination that the trial court erred in ordering petitioner to wear shackles and handcuffs during his trial without making the requisite case-specific findings reflecting "particular concerns, say special security needs or escape risks, related to the defendant on trial."  *See Deck,* 544 U.S. at 633.  It is clear from the record that the trial court did not engage in the sort of individualized inquiry that the Due Process Clause requires.  Indeed, as the trial judge expressly stated (*see* Doc. 25, Ex. 32, Tr. 19), the decision to shackle and handcuff petitioner during trial was not related to petitioner specifically, but rather was made in accordance with an across-the-board, blanket policy applicable to anyone charged with a violent offense, which had been instituted by the judge in light of the then-recent killings of judges in two separate incidents that had been reported in the national news.[11]

---

[11]Although not relevant to the court's inquiry, it is noted that there is evidence in the record indicating that restraints may have been appropriate to use if the proper individualized inquiry had been made in this case.  Petitioner apparently had made threats about killing deputies, had been involved in "many altercations and situations in the jail," and made his own attorney feel "unsafe being around him" in the courtroom.  (*See* Doc. 25, Ex. 32, Tr. 20; Ex. 34, Tr. 8-9; Ex. 36, Tr. 365-66).

The constitutional error committed by the trial court, of ordering the shackling and handcuffing of petitioner at trial without an individualized determination as to the necessity for these restraints, is subject to review for harmless error. *See, e.g., Deck,* 544 U.S. at 635; *Lakin,* 431 F.3d at 966; *Ruimveld,* 404 F.3d at 1015; *Robinson v. Gundy,* 174 Fed.Appx. 886, 893 (6th Cir. Mar. 30, 2006) (not published in Federal Reporter). The case-law is unclear, however, regarding the proper standard to apply in assessing whether or not harmless error occurred.

On the one hand, in *Deck,* which involved certiorari review of a state capital sentence determined during the penalty phase of trial, the Supreme Court held that because shackling is "inherently prejudicial" and the "defendant need not demonstrate actual prejudice to make out a due process violation," the State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained" under *Chapman v. California,* 386 U.S. 18, 24 (1967). *Deck,* 544 U.S. at 635. In *Lakin,* the Sixth Circuit relied on this holding in *Deck* and concluded that the *Chapman* standard was to be applied in deciding whether a shackling error in a non-capital case was harmless on federal habeas review of a state conviction under 28 U.S.C. § 2254. *See Lakin,* 431 F.3d at 966; *but cf. Ruimveld,* 404 F.3d at 1015.

On the other hand, the Supreme Court recently held that in § 2254 proceedings, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard" set forth in *Brecht v. Abrahamson,* 507 U.S. 619 (1993), "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman.*" *Fry v. Pliler,* 127 S.Ct. 2321, 2328 (2007). In contrast to *Chapman,* under *Brecht,* the petitioner is not entitled to federal habeas relief unless the constitutional error in the state criminal trial proceeding had a "substantial and injurious effect or influence in determining the jury's verdict." *See, e.g., Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (quoting *Brecht,* 507 U.S. at 637, in turn quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)); *see also O'Neal v. McAninch,* 513 U.S. 432, 435-36 (1995). Under this harmless error standard, if upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but slight effect," the conviction must stand. *O'Neal,* 513 U.S. at 436-38; *Kotteakos,* 328 U.S. at 764.

The *Brecht* harmless error standard is less onerous for the State to meet and is applicable to "virtually all § 2254 cases" based on concerns of comity and federalism,

37

as well as the States' interest in the finality of state criminal convictions and sentences. *See Fry,* 127 S.Ct. at 2325. However, in *Fry,* the Supreme Court noted that *Brecht* had "suggested" an exception to this general rule "for the 'unusual case' in which a 'deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct . . . infect[s] the integrity of the proceeding.'" *Id.* (quoting *Brecht,* 507 U.S. at 638 n.9). The question whether a shackling error, which is considered "inherently prejudicial," falls within this exception has not yet been decided by the Supreme Court. In light of the Sixth Circuit's *Lakin* decision, and out of an abundance of caution, the Court will assume, without deciding, that the appropriate standard to apply in this case is the more onerous harmless-error standard set forth in *Chapman.*

Here, in assessing the different issue as to whether "plain error" had occurred, the Ohio Court of Appeals determined that petitioner was not prejudiced by the trial court's decision to use restraints on him at trial without first making an individualized determination of the particular security risks posed by him. The court's finding of no prejudice was based solely on the fact that petitioner had voluntarily chosen to wear prison attire at trial, which served to erode the presumption of innocence, and had not shown that the shackles and handcuffs he was ordered to wear further eroded that presumption. The undersigned is not persuaded by this reasoning.

Certainly, as the Ohio Court of Appeals pointed out, it is well-settled that, like shackling, requiring a defendant to wear prison garb at trial is an "inherently prejudicial practice," which serves to erode the presumption of innocence. *See Holbrook,* 475 U.S. at 568-69; *Estelle,* 425 U.S. at 505. However, it does not follow that simply because petitioner chose to wear prison garb at his trial, the "damage was done" and the sight of petitioner in shackles and handcuffs could not have served to further prejudice the jury against him. In contrast to merely requiring the defendant to wear prison attire, the use of physical restraints at trial suggests that the defendant not only is incarcerated on the criminal charges, but also is violent and dangerous enough to pose a security risk in the courtroom.

Therefore, contrary to the state appellate court's summary disposition of this issue, the undersigned concludes that although petitioner chose to wear prison-issue clothing at trial, the additional use of shackles and handcuffs as security measures may well have served to further erode the presumption of innocence and further prejudiced the jury by suggesting that petitioner in fact was a violent and dangerous man who

38

was likely to commit the kind of crime at issue in the trial. *Cf. Ruimveld*, 404 F.3d at 1015-16 (the Sixth Circuit rejected the state appellate court's determination of harmless error on the ground "that 'the jury did not place any unfair importance on defendant's being shackled at trial,' because it 'was aware from the facts of the case that defendant was not only accused in a criminal trial, but was currently incarcerated in the prison on an unrelated charge,'" where the "court did not consider any of the other possible reasons why a jury might be influenced by viewing a defendant in shackles, beyond a mere consideration of the fact that shackles might lead a jury to believe that the defendant is a prisoner or convict").[12]

Therefore, the Court is unable to conclude that the trial court's error in this case was harmless based on the Ohio Court of Appeals's cursory analysis of the prejudice issue on "plain error" review. Nevertheless, upon review of the entire trial transcript, the Court is convinced beyond a reasonable doubt that the trial court's error in ordering the shackling and handcuffing of petitioner at trial without specific and sufficient justification was harmless as it did not contribute to the verdict obtained. *See Deck,* 544 U.S. at 635.

In this case, the evidence against petitioner was overwhelming. Petitioner confessed to killing the victim. (*See* Doc. 25, Ex. 36, Tr. 317-23). The victim was manually strangled and beaten so severely that, among numerous bruises and lacerations, she incurred a broken nose and multiple rib fractures, which punctured her lung; she also endured such forceful blows to the chest that her heart was bruised and suffered a laceration. (*See id.,* Ex. 35, Tr. 137-60; *see also* Doc. 2, Ex. I). In contrast, petitioner suffered only minor injuries during his altercation with the victim. In light of this strong evidence of petitioner's guilt on the murder charge of causing the death of the victim "as a proximate result" of committing a felonious assault offense (*see*

---

[12] In so ruling, the Sixth Circuit pointed out that, among other things, the state appellate court "did not examine whether the jury would believe, due to the shackles, that [petitioner, who was charged with poisoning a prison guard,] was a violent and dangerous man who would be more likely to commit the crime at issue than would other inmates." *Ruimveld,* 404 F.3d at 1015. The Sixth Circuit further stated: "Indeed, the state court's reliance on the fact that [petitioner] was a prisoner is . . . misplaced; the fact that [petitioner] *still* had to be shackled despite the fact that he was already securely within the walls of a maximum security prison and guarded by numerous armed guards might have further prejudiced his case in the eyes of jurors who might have believed him to be a particularly dangerous or violent person, even among inmates." *Id.* at 1016 (emphasis in original).

Doc. 25, Ex. 2), the Court is satisfied that the shackling and handcuffing of petitioner during trial constitutes harmless error under *Chapman.*

Accordingly, in sum, petitioner has not demonstrated that he is entitled to habeas relief based on the claim alleged in Ground Seven of the petition.  Although the trial court erred in ordering him to wear shackles and handcuffs during trial without making the requisite case-specific findings regarding their necessity, such error was harmless in the face of the overwhelming evidence of petitioner's guilt.

### H.  Petitioner Is Not Entitled To Relief Based On The Cumulative-Effect-Of-Errors Claim Alleged In Ground Ten Of The Petition

In Ground Ten of the petition, petitioner alleges that he is entitled to habeas relief based on the cumulative effect of all the constitutional violations that occurred in his criminal trial.  (Doc. 2, p. 7(D)).

This Court has determined that petitioner is not entitled to relief based on any of his individual claims of constitutional error.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002) (citing *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.), *corrected on denial of rehearing*, 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003)), *cert. denied,* 537 U.S. 1192 (2003).  In another more-recent unpublished opinion, the Sixth Circuit cited *Lorraine* as authority for the emphatic statement that "[c]umulative error is not a basis for granting habeas relief in non-capital cases."  *Eskridge v. Konteh,* 88 Fed.Appx. 831, 836 (6th Cir. Feb. 3, 2004) (not published in Federal Reporter); *see also Bradley v. Birkett,* 192 Fed.Appx. 468, 480 (6th Cir. Aug. 21, 2006) (not published in Federal Reporter).

In any event, even if petitioner's cumulative error claim were subject to review, it has no merit.  Even assuming there may have been trial errors, they do not individually or cumulatively rise to the level of depriving petitioner of a fair trial.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's requests for voluntary dismissal of this action (Docs. 47, 51),

which were filed after respondent filed the return of writ responding to petitioner's petition for writ of habeas corpus, be DENIED.

2.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 2) be DENIED with prejudice.

3.  A certificate of appealability should not issue with respect to the claims alleged in Grounds Three, Five, Eleven and a portion of Ground Eight, which this Court has concluded are waived and thus procedurally barred from review, because "jurists of reason" would not find it debatable whether this Court is correct in its procedural rulings.  *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).[13]

A certificate of appealability also should not issue with respect to petitioner's claims alleged in Grounds One, Two, Four, Six, Eight, Nine and Ten of the petition, which have been addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right in any of these grounds for relief.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

A certificate of appealibility should issue only with respect to the claim alleged in Ground Seven of the petition challenging the trial court's order requiring petitioner to appear at trial in shackles and handcuffs without sufficient justification specific to petitioner; petitioner has made a substantial showing that the claim alleged in Ground Seven of the petition is a "viable claim of the denial of a constitutional right" or is "adequate to deserve encouragement to proceed further."  *See Slack,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

4.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore GRANT petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117

---

[13]Because this Court finds that the first prong of the two-part *Slack* standard has not been met in this case, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim for relief in these grounds for relief.  *See Slack*, 529 U.S. at 484.

F.3d 949, 952 (6th Cir. 1997).


Date: 8/30/2007                            s/Timothy S. Hogan
       cbc                          Timothy S. Hogan
                                    United States Magistrate Judge

J:\BRYANCC\2007 habeas orders\06-746denypet.waiv-applerror-judgebias-policebias-lesseroffenseinstruct-iac-cumulerr.wpd

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

William H. Evans, Jr.,
  Petitioner,

           Case No. 1:06cv746
  v.         (Dlott, J.; Hogan, M.J.)

Edwin Voorhies, Jr.,
  Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write *Return Receipt Requested* on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address

2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

William H. Evans
489686
SOCF
PO Box 45699
Lucasville, OH 45699

4a. Article Number

7002 0860 0000 1409 2283

4b. Service Type

☐ Registered          ☑ Certified
☐ Express Mail        ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X

PS Form **3811,** December 1994     102595-97-B-0179     **Domestic Return Receipt**

Is your **RETURN ADDRESS** completed on the reverse side?

Thank you for using Return Receipt Service.

1: 06 cv 746   Docs. 55 + 56